· THE DES MOINES NAT. BANK v. CHISHOLM ET AL.

1. **Promissory Note:** CONSIDERATION: SURRENDER OF COLLATERAL SECURITY: INNOCENT HOLDER. Plaintiff made a loan to the M. bank, with the understanding that it was to have collateral security, and it received the collaterals some time after the loan had been made. Subsequently the cashier of the M. bank secured a return of the collaterals by depositing in their stead an accommodation note signed by himself and some others, among whom were S. and C. The signature of S. had been forged to the note, and C., relying on the genuineness of the signatures already obtained, signed last. Afterwards, C., being the only solvent signer to the note, gave the notes and mortgage sued on in this case in lieu of the accommodation note, and for an extension of time. *Held—*

   (1) That the pre-existing debt from the M. bank to plaintiff was a good consideration for the delivery of the collaterals to plaintiff.

   (2) That the return of the collaterals was a good consideration for the accommodation note.

   (3) That plaintiff must be regarded as a purchaser for value of the accommodation note, and, having had no notice of the fraud by which C.'s signature had been obtained thereto, it was in no manner affected thereby.

   (4) That fraud and want of consideration could not be successfully pleaded against the notes and mortgage in suit.

2. ———: IMBECILITY OF MAKER: UNDUE INFLUENCE: EVIDENCE NOT ESTABLISHING. The evidence in this case considered, (see opinion,) and *held* to show that the maker of the notes and mortgage in question was greatly impaired in mental and physical vigor at the time of their execution, but that he was not lacking in judgment or reason, but was in the possession of all his faculties, and was fully competent to enter into the contract. Also, that there was no evidence of any concealment or deceit or undue influence used in obtaining the execution of the contract.

*Appeal from Monroe Circuit Court.*

TUESDAY, JUNE 14.

THE defendant Alexander Chisholm is administrator of the estate of William Chisholm, deceased. The other defendants are the widow and heirs at law of said William Chisholm. This action is upon three promissory notes, and

for the foreclosure of a mortgage securing the same, exe-. cuted by William Chisholm in his life-time. The defend-ants answered that the notes and mortgage were given without consideration, that William Chisholm was *non compos mentis*, and incapable of contracting, when he executed, them, and that they were procured by fraud. The circuit court entered judgment for the defendants, and plaintiff appeals.

*Mitchell & Dudley* and *Seevers & Sampson*, for appellant.

*W. A. Nickols* and *T. B. Perry*, for appellees.

REED, J.—The facts out of which this controversy arose are as follows: On the eighteenth of August, 1882, the Monroe County Bank, a banking corporation doing business at Albia, made application to plaintiff, whose place of business is at Des Moines, for a loan of $5,000, for four or six months, offering to secure the same with collaterals. The application was by letter. On the next day plaintiff wrote to the bank advising it that it could loan it $3,000. On the twenty-first of August an agent of the Monroe County Bank went to Des Moines, taking with him the promissory note of the bank for $3,000, which plaintiff received, and paid him that amount less the discount. In subsequent correspondence plaintiff agreed to advance an additional $2,000, for which amount, when it received the money, the Monroe County Bank gave its certificate of deposit. This certificate was dated on the twenty-third of August, when the $3,000 note was delivered. A list of notes executed by other parties was also delivered as collateral security, but these plaintiff returned, stating at the time that, if it desired security in the future, it would call for it. Soon after the additional $2,000 was advanced by plaintiff, it received as collateral security a list of notes, amounting in the aggregate to over $11,000. On the thirtieth of September following, the cashier of the

Monroe County Bank sent to plaintiff a promissory note for $5,000, to which his own name, and those of Lewis Miller, D. J. Shields, Hiram Hicks, William Hicks and William Chisholm, were signed, and asked plaintiff to accept it as security for the loan in lieu of the securities formerly deposited, and to return the same to him, which plaintiff did on the thirtieth of September. This $5,000 note was dated September 26th, and by its terms became due in six months from that date. It was payable to the Monroe County Bank or order, and was indorsed by it to plaintiff. The parties who signed it received no consideration for it, but gave it as an accommodation to the bank, in which they were stockholders.

The $3,000 note of the Monroe County Bank, and the certificate of deposit, also became due in six months from their dates. On the eleventh of October following, the Monroe County Bank failed. In a few days after this failure, plaintiff's president went to Albia, accompanied by its attorney, for the purpose of ascertaining whether the security held by it for the loan was good. They ascertained in their investigation that the cashier of the bank and Lewis Miller, another signer of the note, were insolvent; also that the signature of J. D. Shields to the note was a forgery. They had an interview with Chisholm, and Hiram and William Hicks, the other signers, and the proposition was made to accept the notes of each of these parties for one-third of the amount, with the other two in each case as sureties. Chisholm, it appears, was at first willing to enter into this arrangement, but the other parties declined to enter into it. The parties took counsel of their attorneys, and were advised that, inasmuch as they had signed the note after the name of Shields had been attached to it, and in the belief that his signature was genuine, and plaintiff had taken it as security for a pre-existing debt, without extending the time of payment, its collection could not be enforced against them. At that time it was not known, either to the parties, or to the attorneys

who gave the advice, that plaintiff, when it accepted the note, had surrendered other collaterals which it held as security for the debt. When they received this advice, the parties agreed among themselves that they would take no further action with reference to the matter, except on the advice of their counsel.

In the following February, Chisholm learned that the Hickses had transferred their property to other parties, and he believed that this was done for the purpose of defrauding their creditors. An action had in the mean time been commenced against them, and the other stockholders of the bank, by creditors of that institution, for the purpose of charging them with a very large amount of its liabilities. On the sixth of March, Chisholm wrote to plaintiff admitting his liability on the note, and stating that he was preparing to pay one-third of the amount; also admitting that, in the interview with its president and attorney in the previous October, he was willing to enter into the arrangement which was proposed, but stating that the other parties refused to make that settlement. He also informed it of what the Hickses had done, and his belief as to their purpose in doing so, and he asked it to deal as leniently as possible with him, and stated that he would be compelled to either borrow money, or procure an extension of time from it.

On the nineteenth of the same month he again wrote to plaintiff, stating that it appeared to him that he would have to meet the whole burden of the liability, and, if so, he would be compelled to ask an extension of time, and suggesting that some person be sent to meet him at Albia, on a certain day, to arrange the matter. An engagement was accordingly made to meet him on the 23d. On that day the attorney of plaintiff went to Albia and met him; he having gone from his home, six miles in the country, for that purpose. In the interview which followed it was agreed that he should give them notes falling due at different times, amounting in the aggregate to $5,250, and secure the same

by mortgage on real estate. He accordingly sent for his wife, who was at their home, and when she arrived the notes and mortgage were executed. The $250 which was included in the notes, in addition to the amount of the original indebtedness, was added for the purpose of covering the expenses incurred by plaintiff in connection with the settlement. Chisholm made an effort to induce the Hickses to join with him in the settlement, but they refused. He was in very feeble health at the time, and for some months had been suffering from a disease of the throat and lungs, which caused his death on the fourteenth of April following. He was a depositor in the Monroe County Bank, and lost quite heavily by its failure, and he had been greatly harassed and distressed by the loss, and the attempt to charge him with liability for the debts of the bank.

I. The first defense pleaded is that the notes and mortgage were given without consideration. This defense, it is proper to say, has not been much insisted upon in this court. The facts pleaded as the basis of the defense are that the signature of Chisholm to the accommodation note was obtained by fraud; the fraud being perpetrated by the cashier

*1. PROMIS- SORY note : considera- tion : surren- der of collat- eral security: innocent holder.*

of the Monroe County Bank in procuring him to sign it in the belief that the signature of Shields, which had been previously attached, was genuine, while he knew it was a forgery, and that plaintiff accepted it as security for a pre-existing indebtedness, without an agreement for an extension of time or other consideration. But the fact is, as shown by the evidence, without conflict or dispute, that plaintiff accepted the note in lieu of other collaterals which it held, and which it surrendered at the time of accepting it.

On this state of facts, plaintiff is a purchaser of the note for value. It makes no difference that the collateral notes surrendered in the transaction were not delivered to plaintiff until after the loan was made. They were delivered and accepted as security for the debt. The existence of the debt

was a sufficient consideration, as between the parties, for the transfer of the property. *Meyer v. Evans*, 66 Iowa, 179. As plaintiff held those securities under a valid transfer, its surrender of them was a valid consideration for the transfer of the note to it; and, as it was a holder of the note for value, the defense that the maker's signature was obtained by the fraud alleged would not have been available against it in its hands, there being no claim that it had any notice or knowledge of the fraud by which Chisholm's signature to the note was obtained. The contract in question, then, is supported by a valid consideration.

II. The next defense pleaded, and the one principally relied on, is that Chisholm, at the time the contract was entered into, was in such mental condition that he was incapable of contracting. As stated above, he was, and for some time previously had been, suffering from a disease which was the one that caused his death in about three weeks after the contract was executed. He had previously been a man of great force of character, and had been engaged in business enterprises of considerable magnitude, which he had conducted with success. He had also been a man of great physical energy, and had been active in the pursuit of his business. But at the time of the transaction he was greatly reduced in physical strength, being barely able to walk, and being unable to speak above a whisper; and the evidence leaves no doubt but that his intellectual vigor was greatly impaired. In addition to the weakness caused by his disease; he had been vexed and worried by his losses and the unfortunate complication into which his affairs had fallen.

2. ———: imbecility of maker: undue influence: evidence not establishing.

Twenty-nine witnesses were examined by defendants on the question of his mental condition, four of whom are physicians of learning and long practice in their profession. All of these witnesses had been intimately acquainted with him for many years, and they all testified with reference to their personal knowledge of the man. While none of them

claimed that he was insane or imbecile, they quite uniformly gave it as their opinion that he was incapable, at the time, of transacting business which was complicated, or which involved large interests. They all admitted, however, that they believed him competent to transact the ordinary business pertaining to his affairs. If we were to look alone at the evidence of these witnesses, we might concur in the conclusion reached by the circuit court, that he was incapable of contracting; but other facts are proven which must be considered in determining the question. It is shown that he had not ceased to give attention to his ordinary affairs, and he transacted his business with intelligence and judgment. His letters to plaintiff, which brought about the meeting at Albia, at which the contract was entered into, show that his memory was good, and that he retained a keen sense of his liability and his obligation. He expressed himself with clearness and perspicuity. He made an honest and clear statement of his circumstances and intentions, and applied for an extension of time, stating the rate of interest which he would be willing to pay, and asked for a meeting for the purpose of adjusting the matter. These letters were written but a few days before the accommodation note would fall due, and were doubtless written in view of that fact. When the day appointed for the meeting arrived, he went, notwithstanding his weakness, and against the advice of his friends, to meet his engagement. He appears to have been actuated by that conscientious desire to perform his undertakings which had characterized him during all his life. His conduct and language after the transaction show that he fully understood what he had done, and that he regarded it as the best thing he could have done under the circumstances. In a letter written by him afterwards to the attorney with whom he made the settlement, he told him that he had been criticised for what he had done by the Hickses, and the attorneys whose advice he had formerly taken, but that he was satisfied with the arrangement he had made.

Very shortly before the settlement, and afterwards, he transacted other matters of business which appear to us to have been quite as complicated, although not involving as large interests, as that in question, and in the transactions he acted intelligently and with judgment.

These facts lead us to the conclusion that he was not *non compos*. His mind lacked the vigor it formerly possessed, but he was not lacking in judgment or reason, but was in possession of all his faculties, and was fully competent to enter into the contract. We will not be understood as unduly disparaging the testimony of the witnesses whose opinions on the subject were given in evidence. The four physicians who were examined appear to be learned in their profession, and all of the witnesses are men of candor and high character; but testimony of that kind has always been regarded as of the lowest character of evidence, and in this case it clearly does not overcome the evidence of the established and conceded facts.

III. Another defense is that the contract was obtained by the fraud of the attorney who acted for the plaintiff in making the settlement. We do not deem it necessary to discuss the evidence relied on to establish this claim. It is sufficient to say that we find no evidence whatever that any concealment or deceit was practiced by the attorney, or that any undue influence was exercised to induce Mr. Chisholm to enter into the contract. The attorney was careful to secure the interest of his client, but he had the right, and it was his duty, to do that, if he proceeded by fair means, and we find no evidence that he resorted to any other.

As we reach the conclusion that the contract is supported by a valid consideration, that the parties were competent to enter into it, and that it was fairly entered into, it follows that it should be enforced.

REVERSED.