## GILBERT HARRISON, *et al.*, Appellants, v. FRANK OTLEY, *et al.*

**Action to Set Deed Aside:** MENTAL INCAPACITY: *Evidence.* Where a contract for the conveyance of property has been fully executed and the grantee cannot be placed *in statu quo*, the fact that the grantor was, at times prior to the transaction, erratic, or even mentally unbalanced, is not sufficient ground for setting it aside, when such fact was not known to the grantee, and the price paid was not so inadequate as to charge him with notice of any mental weakness of the grantor.

SAME. A sale of fifteen hundred acres of land worth twenty-three dollars per acre, for a little more than the amount of the mortgages thereon amounting to sixteen dollars per acre, on which foreclosure proceedings are about to be commenced, is not so unreasonable as to indicate a lack of mental capacity in the vendor, where he has unsuccessfully attempted to procure the money with which to pay off the mortgages, and the mortgagees refuse to release any part of the land.

SAME. The validity of a sale of land must be determined by the conditions existing when the sale was made.

---

*Appeal from Plymouth District Court.*—HON. FRANK
R. GAYNOR, Judge.

SATURDAY, APRIL 10, 1897.

ACTION in equity to set aside conveyances of real
estate and personal property, and, if that cannot be
done, for judgment for the value of the interest con-
veyed and for general equitable relief. There was
a hearing on the merits, and a judgment in favor of
the defendants for costs. The plaintiffs appeal.—
*Affirmed.*

*P. W. Cain* and *Lewis & Beardsley* for appellants.

*Argo & McDuffie* and *I. S. Struble* for appellees.

ROBINSON, J.—On the tenth day of July, 1890,
Benjamin Harrison conveyed to Frank Otley one
thousand five hundred acres of land, all of which was
in Plymouth county, excepting one quarter section,
which was in the county of Woodbury. The lands
conveyed were subject to mortgages to the amount of
twenty-two thousand dollars, besides interest and
taxes. On the same day Harrison gave to Otley a bill
of sale, which transfered a large amount of personal
property, which was also incumbered. The considera-
tion for these conveyances was four hundred dollars
in money, a promissory note for the sum of one thou-
sand dollars, and three hundred and thirty acres of
land in the state of Kansas, which were subject to a
mortgage of one thousand four hundred dollars.
After a short time the Kansas land was surrendered,
and in lieu thereof a quarter section of land in Wood-
bury county, in this state, subject to a mortgage
thereon of sixteen dollars per acre, and two young
horses, worth about one hundred and fifty dollars

were given. The negotiations which ended in the transaction of July 10, 1890, were carried on by Harrison with L. D. Clay. The latter acted partly for himself, as he claims, and partly for C. E. Corkery. Otley does not appear to have any pecuniary interest in the transaction, and in what he did acted for Corkery, to whom he conveyed the property the day after he received it. In July, 1892, Harrison was examined by the board of commissioners of insanity for Woodbury county, was found to be insane, and was sent to the hospital for the insane at Clarinda, where he died a few weeks later. This action was commenced in September of the same year. The grounds upon which the conveyances in question were assailed are alleged to be that Harrison was insane when they were made, and for that reason incapable of making a valid contract for the sale or other disposition of his property; that during the negotiations for the conveyances, Clay gave to Harrison whisky, and represented that he would help him to procure a loan of money at a low rate of interest; and that by these means Clay obtained an undue influence over Harrison, and thus procured the conveyances for much less than the value of the property conveyed. It is further claimed that Harrison's wife knew nothing of the fraud practiced upon him, and signed the conveyances of land in consequence of threats by him of great bodily injury if she refused to sign them. The plaintiffs are Lillian Harrison the widow of the decedent, and his children, Gilbert Harrison, Burt Harrison, and Ophelia Harrison. The two last named are minors, and appear by Lillian Harrison as next friend. The defendants are Otley, Corkery, Clay, and numerous other persons to whom portions of the land in question have been conveyed or mortgaged, or who are alleged to have some interest in the matters in litigation. The charges of wrongful conduct and undue influence on the part of Clay are not

established, and will not. be further noticed. The
insanity of Harrison in the year 1892, and his death as
stated, are not questioned. We are required to deter-
mine whether he possessed sufficient mental. capacity
to make a valid contract when the conveyances
in question were executed, and, if he did
not, whether the defendants, or any of them, had
such knowledge of his condition as to affect the
interests in his property which they claim to have
acquired. The record submitted to us extends through
more than five hundred printed pages, and the evi-
dence is in irreconcilable conflict as to all of the
important questions in the case. It would be useless
even to give an extended synopsis of the evidence, and
we shall not attempt to do so but in our opinion, it
shows facts substantially as follows: Harrison was a
large, energetic man, of nervous and somewhat excit-
able temperament, who carried on a large business.
He was illiterate, not being able to write more than
his own name, but he attended personally to improv-
ing and carrying on his farms. He leased some of them
and others were cultivated by men he employed for
that purpose. At times he had from twenty to twenty-
five men thus engaged. He had a large number of
farming implements and much machinery, including
steam threshers, and his annual receipts and expendi-
tures were large. He continued to carry on this
extensive business until the conveyances in question
were made, although he was aided in it somewhat by
his son Gilbert, and in a few matters by others. His
eyesight had been poor for a time, and in July, 1890,
he could see but little. For that reason he was usually
accompanied on business trips to towns in the vicinity
by an employe, or member of his family, but he almost
invariably transacted the business which was done or
gave directions in regard to it. In the last week in May,
1890, he made a business trip to Indiana and Michigan,

and was accompanied by a· man named Gardner, and a considerable portion of the time by one Johnson. Gardner testifies that during the trip Harrison was almost helpless; that "he seemed like he had no mind; he seemed to have no control of his· mind." But facts stated by Gardner satisfy us that Harrison showed much intelligence and business sagacity during the trip. Johnson represented the holders of the mortgages on Harrison's land, and accompanied him to aid in investigating certain property in which he claimed an interest and on which he hoped to raise money. Johnson had known Harrison for several years, and states that during the trip he was fully capable of doing his own thinking and planning, and did nothing to indicate that his mind was not sound. In June, after the trip, Harrison visited Johnson, and did not show any indication of insanity. Others who saw Harrison at about the same time, and had dealings with him, saw no indications of insanity, and believed him to be of sound mind. There were times, however, when he showed some unsteadiness of mind, and when by shedding tears, wringing his hands, and twisting his hat, he gave indications of mental agitation, if not of mental weakness. Some of his neighbors and others testify that he had been mentally unsound for several years before July, 1890, and that the fact was frequently the subject of remark in the neighborhood, while others, who knew and had frequent business transactions with him during the same time, are equally positive that he was sane and capable of transacting business. It is undoubtedly true that he was somewhat eccentric at times, and that some of his business transactions were unwise. He purchased, from time to time, a large amount of property and incurred numerous debts. But in that respect he was like many business men whose sanity is not and cannot be successfully questioned. When

the conveyances to Otley were made, Harrison's financial condition appears to have been about as follows: His lands were incumbered by two mortgages, each of which included all of the land, to the amount of about sixteen dollars per acre. It is difficult to determine with accuracy the value of the land, but we are of the opinion that it is not shown to have exceeded twenty-two dollars, or twenty-three dollars per acre, and sales of land were few, the demand being light. Harrison also owned a large amount of personal property, which was conveyed to Otley. The only witness who was examined at much length in regard to its value stated that he thought it was worth twelve thousand dollars, although, when asked in regard to the value of the various articles of which it was composed, he testified to various sums which aggregated about one-half that amount. The property was conveyed subject to incumbrances, the amount of which is not shown. The only witness who attempts to give the amount states that the records showed that Harrison had a chattel mortgage and judgment indebtedness to the amount of several thousand dollars, perhaps twelve or fifteen thousand. Of that, but about five hundred dollars is shown to have been in judgment, and that was secured by chattel mortgage. The evidence on this branch of the case is so indefinite and unsatisfactory that we cannot say that the personal property was worth much, if anything, more than the incumbrance upon it. Harrison at this time was greatly pressed for money. Interest on his farm loans was due and unpaid; the holders of the mortgages were demanding immediate payment, and had placed them in the hands of an attorney for foreclosure. He had endeavored, without success, to arrange for the release of the mortgages on such parts of the land as he might be able to sell, and had failed in all his efforts to borrow money. In consequence, he was afraid that he might lose all of

his property. While his affairs were in that condition, he applied to Clay, who was a real estate and loan agent, of Le Mars, for help. Clay made several efforts to procure a loan for Harrison, sufficiently large to meet his necessities, but did not succeed. The value of the land in question was so little in ·excess of the amount required, that the loan could not be obtained. After some time spent in efforts to procure a loan, or dispose of the property, the sale to Otley was proposed, and finally made. In view of the conditions under which it was effected, we cannot say it was so unreasonable as to indicate a lack of mental capacity in Harrison to make a valid contract. In consequence of the mortgages upon the land, he could only sell it all together, and there was no demand for so large a tract. He could not raise money by borrowing, and, as foreclosure proceedings were about to be commenced, he desired to save at least a home from what he had. It was not certain that he would save so much as that if he could not dispose of the land when he did, and he did what many others of sound mind might have done under the same circumstances. Several of the most important witnesses for the plaintiffs, including a brother of Harrison, were present when the sale was completed, and not only made no objection to it, but evidently thought it a wise thing for Harrison to do. During the latter part of the year 1890, the lands in question began to rise in value, and at the time of the trial they were worth from five to seven dollars per acre more than they were in July, 1890; but the validity of the transaction with Clay, Otley, and Corkery must be determined by the conditions which existed when it was completed. The law presumes that it was valid, and that Harrison possessed a contracting mind at that time. The burden was on the plaintiffs to overcome that presumption,

and in that we think they have failed. In reaching this conclusion, it is not necessary to find that Harrison's mind was wholly unimpaired. Mere weakness of intellect in a party to a contract is not a sufficient ground for setting it aside. *Harris v. Wamsley*, 41 Iowa, 673. See, also, *Emerick v. Emerick*, 83 Iowa, 411 (49 N. W. Rep. 1017), and cases therein cited; *Cocke v. Montgomery*, 75 Iowa, 260 (39 N. W. Rep. 386); *Bank v. Chisholm*, 71 Iowa, 680 (33 N. W. Rep. 234); Clark, Cont., 265. But the conveyances in question are in the nature of executed contracts, and a further obstacle to setting them aside is that, if it be conceded that Harrison was not competent to make them, it is not shown that Clay, Otley, or Corkery knew that fact, and they cannot be placed in *statu quo*. The consideration paid by them was not so inadequate as to charge them with notice of his mental condition. *Alexander v. Haskins*, 68 Iowa, 74 (25 N. W. Rep. 935); *Abbott v. Creal*, 56 Iowa, 177 (9 N. W. Rep. 115); *Ashcraft v. De Armond*, 44 Iowa, 232; *Behrens v. McKenzie*, 23 Iowa, 343; *Warfield v. Warfield*, 76 Iowa, 635 (41 N. W. Rep. 383), 11 Am. & Eng. Enc. Law, 136. We conclude that the plaintiffs have failed to show sufficient grounds upon which to set aside the conveyances in question, and the judgment of the district court is AFFIRMED.